**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:14cv92-RLV**

| | |
|---|---|
| PATRICIA ANN BLACK, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| vs. ) | **ORDER** |
| ) | |
| FRANK L. PERRY, ) | |
| MIRANDA B. RICHARDSON, ) | |
| ) | |
| Respondents. ) | |
| _____) | |

**THIS MATTER** is before the Court upon Petitioner Patricia Ann Black's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) Also before the Court is Respondents' Motion for Summary Judgment. (Doc. No. 4.)

**I. BACKGROUND**

Petitioner was convicted on May 17, 2011, after a trial by jury in the Superior Court, Lincoln County, of three counts of aiding and abetting statutory rape, two counts of conspiracy to commit statutory rape, two counts of first degree sexual offense, two counts of first degree kidnaping, three counts of taking indecent liberties with children, and two counts of felony child abuse. The trial court arrested judgment on the two counts of first degree kidnapping and sentenced Petitioner for second degree kidnapping. The trial court also arrested judgment on one count of felony child abuse.

The North Carolina Court of Appeals summarized the evidence presented at trial as follows:

> Defendant and her husband, Jimmy Black, were the parents of two children, "Deborah" and "John."FN1 Deborah is mentally retarded with an IQ of about 60.

1

Deborah testified that when she was 12 years old, her father had sexual intercourse with her. Deborah told defendant what had happened, but her mother did nothing. Mr. Black had sexual intercourse with her again when she was 14 years old. In addition, on another occasion, Mr. Black watched Deborah take a shower even though she asked him to leave. Defendant and Mr. Black told Deborah not to tell anyone what Mr. Black had done, or they would go to jail.

> FN1. Throughout this opinion, the pseudonyms "Deborah," "John," "Mary," and "Sarah" are used to protect the identities of minor witnesses and for ease of reading

Defendant shaved Deborah's pubic hair until sometime after she turned 14 years old. Defendant claimed that the shaving took place until Deborah was 11 or 12 because Deborah was taking growth hormones that caused very thick pubic hair. The doctor's records, however, showed that the growth hormones were stopped when Deborah was eight years old, and other relatives confirmed that defendant was still shaving Deborah when she was 14. Additionally, defendant gave Deborah a purple vibrator to use to masturbate and told others that Deborah had been masturbating since she was seven or eight years old.

Deborah confided to her cousin Mary about what her father had done. Mary and Deborah went to school together. Deborah told Mary: "'My daddy's been touching me with his stuff.'" When Mary told defendant and Mr. Black what Deborah had said, they told Mary it was not true, and, then, according to Mary, they "got on [Deborah] for saying that it was."

From mid–2007 to August 2008, Mary spent 150 to 200 nights with Deborah's family. On Mary's 13th birthday, in July 2007, Mary spent the night at the Black family's house. After the other children had gone to bed, defendant and Mr. Black asked Mary to have sex with the two of them. Although she initially refused, Mr. Black threatened her, and she agreed.

Defendant, Mr. Black, and Mary went to the Blacks' bedroom where defendant touched Mary's breasts and inserted two fingers in Mary's vagina. Mr. Black engaged in sexual intercourse with both defendant and Mary. On subsequent occasions, Mary smoked marijuana and drank beer with defendant and Mr. Black. They also gave Mary Xanax, which she identified as a blue pill. Mary would wake up in the morning between them unable to remember what had happened. Deborah confirmed that when she got up, she sometimes saw Mary sleeping with defendant.

A third girl, Sarah, who was also 13, went to middle school with Deborah. Sarah spent the night at the Blacks' home two or three times. During the first visit, defendant and Mr. Black asked her if she was bisexual, and she said "[y]es." On her second visit, defendant and Mr. Black gave her alcohol to drink and a blue pill. She later got up after everyone had gone to bed and found Mr. Black watching pornography in the living room. After Mr. Black threatened to kill Sarah, she agreed to have sex with him. He took her behind the kitchen counter, told her to take her pants off, and engaged in sexual intercourse with her.

In addition, defendant took a shower with Sarah and, afterwards, Sarah had a "threesome" with defendant and Mr. Black, during which defendant touched Sarah's vagina with her tongue and Mr. Black had sexual intercourse with Sarah. Subsequently, defendant and Mr. Black got angry when Sarah said she would not engage in the sexual conduct anymore, and they would not let her see Deborah.

The Department of Social Services ("DSS") initiated an investigation in August 2008 when it received a report that Sarah had made allegations against defendant and Mr. Black. Sandra Huneycutt, a DSS social worker, and Jim Etters, a detective with the Lincoln County Sheriff's Department, interviewed Sarah. Later, Sarah was interviewed on videotape at the Child Advocacy Center.

After questioning Sarah, Ms. Huneycutt and Detective Etters went to the Blacks' home. When they arrived, defendant, Mr. Black, John, Deborah, and Mary were all there. Defendant, Deborah, and Mary were all wearing matching tank tops from "Hooters." Defendant and Mr. Black were told that DSS had received a report involving the two of them. Before defendant and Mr. Black heard any details of the report, defendant told them that she suspected that Sarah had made the allegations, and defendant then called Sarah a "whore and ... a slut." When asked about her drug use, defendant indicated she had a prescription for Xanax, which is a blue pill.

After Mr. Black was arrested, Ms. Huneycutt interviewed Mary. Mary told Ms. Huneycutt about what had happened to her and also that Deborah had confided in her about sexual incidents with her father. Mary had not previously reported the incidents to anyone because Mr. Black had threatened that she would come up missing. She later told her father (Mr. Black's cousin) about what had happened, but did not tell him all the details because he had a temper.

Ms. Huneycutt then went back to the Blacks' house and talked to them again about Deborah. They denied that anything had occurred, but cooperated in finding another place for Deborah and John to stay. Deborah and John went to stay with their paternal grandmother, Betty Black. The grandmother subsequently told Ms. Huneycutt that she did not believe Deborah's story and that Deborah could no longer stay with her. Deborah then went to stay with Kathy Black, her paternal great-aunt, for two months. She returned to her grandmother for six months, but was placed in foster care in May 2009.

In September 2008, Deborah began seeing Nadia Antoszyk, a licensed clinical social worker. During therapy, Deborah used dolls to show what had happened to her. Deborah expressed love for her parents and missed them. She was sad about being cut off from her family and felt blamed for her parents being in jail. Her grandmother told Deborah often that she did not believe Deborah, she discouraged Deborah from talking to Ms. Antoszyk, and threatened Deborah that she would be removed, making Deborah anxious and conflicted by loyalty to her family. Deborah had imaginary friends and characteristics consistent with child abuse— anger, social withdrawal, frequent masturbation, and behavior that was sexually provocative.

Once Deborah was in a foster home and new school, her anxiety level and ability to pay attention improved. The number of imaginary friends she had decreased, and Deborah did not mention them as often. While Deborah had recanted at times and said she had lied, once she was in a foster home, she did not make any other statements suggesting that she had lied about her parents.

Defendant was indicted for [multiple offenses involving each girl]. . . .

At trial, defendant testified on her own behalf and denied the allegations. She also presented evidence that tended to show that Deborah stood up in church on one occasion and, while crying, said that she had lied and told her parents that she was sorry. Defendant presented other evidence that Deborah told a cousin that her mother did not do anything and that Nadia Antoszyk was trying to put words in her mouth. John testified that he had seen Ms. Antoszyk several times, but stopped because she called his family "dysfunctional" and tried to put words in his mouth, making him angry. Defendant also presented evidence that Deborah told her grandmother that she hated meeting with Ms. Antoszyk and that Ms. Antoszyk would make her say things she did not want to say. According to defendant's witnesses, Deborah told her grandmother, including in a family therapy session, that she had lied and put her mother and father in jail. In addition, defendant presented evidence that Deborah had said that the devil raped her and that Deborah hit her grandmother and shoved her into a bookcase.

Defendant pointed out differences in Mary's and Sarah's testimony at trial from their testimony during a DSS proceeding. Defendant elicited testimony that Sarah was living in a group home for out-of-control behavior and missing school. Defendant also presented evidence that Deborah was not allowed to see Sarah anymore because Deborah had told them that Sarah was showing her breasts on the internet and wanted Deborah to do that too. In addition, when defendant had Sarah kicked out of a pool, Sarah threatened, "Bitch, I will put you both in jail."

State v. Black, 735 S.E.2d 195, 196-98 (N.C. Ct. App. 2012).

Petitioner filed a direct appeal. Relevant here are her claims that the trial court committed plain error by allowing social worker Nadia Antoszyk to improperly vouch for Deborah's credibility and that she received ineffective assistance of counsel because her attorney did not object to Antoszyk's comments.

The North Carolina Court of Appeals agreed that admission of some of Antoszyk's testimony was error but held that Petitioner had failed to demonstrate sufficient prejudice to establish plain error. Id. at 196. Additionally, the appellate court concluded that because

Petitioner had failed to show sufficient prejudice for plain error, she also failed to establish prejudice for purposes of her ineffective assistance of counsel claim.  Id. at 201.  Petitioner sought discretionary review in the North Carolina Supreme Court, which was denied on March 7, 2013.  State v. Black, 738 S.E.2d 391 (N.C. 2013).

Petitioner, represented by counsel from North Carolina Prisoner Legal Services, Inc., filed the instant § 2254 Petition in federal district court on June 5, 2014.  (Doc. No. 1.)  The Court ordered Respondents to answer, and on July 17, 2014, they filed a Response (Doc. No. 3) and a Motion for Summary Judgment (Doc. No. 4).  Counsel for Petitioner subsequently filed a notice of intent to rest on the merits of the Petition and declined to respond to the Motion for Summary Judgment.  (Doc. No. 6.)  This matter is ripe for adjudication.

## II. STANDARD OF REVIEW

### A. Summary Judgment

Summary judgment is appropriate in those cases where there is no genuine dispute as to any material fact, and it appears that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2); United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991).  Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986).  Where, however, the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986).

### B. The Antiterrorism and Effective Death Penalty Act of 1996

Review of Petitioner's claims that were adjudicated on their merits by the state courts is limited by the deferential standard set forth in the Antiterrorism and Effective Death Penalty Act

of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), as construed by the Supreme Court in Williams v. Taylor, 529 U.S. 362, 374-91 (2000). This Court may grant habeas relief on claims of constitutional error adjudicated on their merits in state court only if that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).

A decision is "contrary to" Supreme Court precedent if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [an opposite result]." Williams, 529 U.S. at 405. A state court unreasonably applies federal law when it "identifies the correct governing legal rule from th[e Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case." Williams, 529 U.S. at 407. A state court's determination that a claim fails on its merits cannot be overturned by a federal habeas court "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

## III  DISCUSSION

Petitioner challenges only the state court's decision to deny her claim of ineffective assistance of trial counsel based upon counsel's failure to object to certain portions of Antoszyk's testimony. (Pet. 2, Doc. No. 1.) Antoszyk was allowed to testify as an expert in the fields of diagnosing and treating mental health disorders and of child and family therapy. See Black, 735 S.E.2d at 199. In response to a question about Deborah's treatment, Antoszyk

6

answered in part: "For a child, that means . . . being able to, um, come to terms with all the issues that are consistent with someone that has been sexually abused." Id. at 199-200. Antoszyk also repeatedly stated her conclusion that the sexual abuse experienced by Deborah started at a young age, perhaps age seven, and continued until she was removed from the home by DSS. Id. at 200.

Further, when asked why Deborah had lashed out at her grandmother, Antoszyk explained that the behavior was "part of a history of a child that goes through sexual abuse." Id. With respect to her concerns about the adequacy of the grandmother's caregiving, Antoszyk testified: "She had every opportunity to get the education and the information to become an informed parent about a child that is sexually abused." Id. And, when asked if it was reasonable for the grandmother to have some doubt as to Deborah's story given Deborah's recanting on multiple occasions, Antoszyk responded: "With me, there was no uncertainty." Id. Because defense counsel did not object to these portions of Antoszyk's testimony, Petitioner asserted on direct appeal that the trial court committed plain error in admitting them and that counsel was ineffective for failing to object. See Black, 735 S.E.2d at 199.

In State v. Lawrence, the North Carolina Supreme Court reaffirmed the state's plain error standard of review and clarified how it applies on appeal to unpreserved instructional or evidentiary error:

> For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affect[s] the fairness, integrity or public reputation of judicial proceedings[.]

7

723 S.E.2d 326, 334 (N.C. 2012) (internal citations and quotation marks omitted). In this case, the appellate court agreed with Petitioner that the challenged portions of Antoszyk's testimony were improper. Black, 735 S.E.2d at 200 ("Each time, Ms. Antoszyk effectively asserted that Deborah was a sexually abused child even though the State had presented no physical evidence of abuse."); see also State v. Stancil, 559 S.E.2d 788, 789 (N.C. 2002) ("In a sexual offense prosecution involving a child victim, the trial court should not admit expert opinion that sexual abuse has in fact occurred because, absent physical evidence supporting a diagnosis of sexual abuse, such testimony is an impermissible opinion regarding the victim's credibility.") (internal citations omitted). When looking at the record as a whole, however, the court could not conclude "that the jury would probably have reached a different verdict in the absence of Ms. Antoszyk's improper testimony." Black, 735 S.E.2d at 201. Consequently, it held that Petitioner had failed to demonstrate plain error. Id.

Additionally, the appellate court held that because Petitioner "failed to show sufficient prejudice for plain error, she also failed to establish prejudice for purposes of her ineffective assistance of counsel claim." Id. It is this holding that Petitioner challenges.

To prevail on an ineffective assistance of counsel claim, a defendant must demonstrate that: (1) counsel's performance was deficient—that is, the representation was objectively unreasonable, and (2) counsel's deficient performance prejudiced the defendant—that is, there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). Petitioner contends that the prejudice test under North Carolina's plain error standard -- "probable impact on the jury's finding that the defendant was guilty" – imposes a heavier burden on defendants than does the prejudice test under Strickland. (Pet. 8, Doc. No. 1 (citing Schlup v. Delo, 513 U.S. 298, 327

(1995))). Respondents, on the other hand, contend that the difference between North Carolina's plain error prejudice standard and Strickland's prejudice test is negligible. (Resp't's Mem. of Support 22, Doc. No. 5.)

Petitioner has the better argument. "Probable," when used alone as a standard to measure prejudice, means "more likely than not" or "a preponderance of the evidence." See e.g. United States v. Dominguez Benitez, 542 U.S. 74, 86-87 (2004) (Scalia, J., concurring in the judgment) (rejecting the majority's adoption of the "reasonable probability" standard for federal plain error review of alleged Rule 11 errors). North Carolina's "plain error" rule requires a defendant to show that "absent the error the jury probably would have reached a different verdict. . . . In other words, . . . the error in question 'tilted the scales' and caused the jury to reach its verdict convicting the defendant." State v. Walker, 340 S.E.2d 80, 83 (N.C. 1986) (citations omitted). Under Strickland, however, counsel's deficient performance is prejudicial if it simply "undermines confidence" in the result of the trial. 466 U.S. at 693-94 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.").

The North Carolina courts, themselves, have recognized that the state's plain error prejudice standard imposes a heavier burden on a defendant than does Strickland. In State v. Joplin, the North Carolina Supreme Court observed that "the test for 'plain error' places a much heavier burden upon the defendant than that imposed by N.C.G.S. § 15A-1443 upon defendants who have preserved their rights by timely objection." 347 S.E.2d 421, 424 (N.C. 1986). Section 15A-1443(a) requires defendants who preserve their rights by timely objection at trial to demonstrate "a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial." See also State v. Sanderson, 488 S.E.2d 133, 141 (N.C. 1997) (explaining that

9

the test for prejudice under N.C.G.S. § 15A–1443(a) mirrors the Strickland test); Moore v. Hardee, 723 F.3d 488, 500 (4th Cir. 2013) (recognizing that North Carolina's plain error prejudice test differs from the Strickland test for prejudice). It does not necessarily follow, therefore, that there can be no prejudice under Strickland when there is no plain error under North Carolina's plain error standard.

By requiring Petitioner to meet the prejudice standard for plain error in order to prevail on her ineffective assistance of counsel claim, the state appellate court applied a rule that contradicts the governing law set forth by the Supreme Court in Strickland. See Williams, 529 U.S. at 405-06 ("If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be . . . "opposite in character or nature," and "mutually opposed" to our clearly established precedent because we held in Strickland that the prisoner need only demonstrate a 'reasonable probability that ... the result of the proceeding would have been different.'") (quoting Strickland, 466 U.S. at 694). Thus, the appellate court's adjudication of Petitioner's ineffective assistance of counsel claim resulted in a decision that was contrary to clearly established federal law.[1]

That does not end the Court's inquiry, however. "[W]hen a state court decision is 'contrary to' governing Supreme Court law, [the habeas court] engage[s] in de novo review of the prisoner's claim." Moody v. Polk, 408 F.3d 141, 147 (4th Cir. 2005) (citing Rose v. Lee, 252 F.3d 676, 689–90 (4th Cir. 2001)).

---

[1] Not only does the appellate court opinion fail to identify Strickland, or a state court case adopting it, as the governing legal rule, it does not cite the standard for either the deficiency or prejudice prong that a defendant must meet to prove an ineffective assistance of counsel claim. Cf. Williams v. Taylor, 529 U.S. at 407 (A state court unreasonably applies federal law when it "identifies the correct governing legal rule from th[e Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case."). Furthermore, the case that the opinion does cite involved a harmless error analysis, not plain error. Black, 735 S.E.2d at 201 (citing State v. Phillips, 711 S.E.2d 122, 153 (2011)).

"The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." Kimmelman v. Morrison, 477 U.S. 365, 374 (1986). When assessing counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689. [2]

In addition to charges related to Mary and Sarah, Petitioner was charged with aiding and abetting her husband, Jimmy Black, in the commission of first-degree statutory rape of Deborah, indecent liberties with a child (Deborah), and felony child abuse inflicting serious injury on Deborah. (R. on Appeal 6-8, Doc. No. 5-4.) Petitioner also was charged with felony child abuse for doing nothing to stop her husband's abuse of Deborah. (R., supra, at 6.) Because there was no physical evidence offered by the State to support a diagnosis of sexual abuse of Deborah, the State had to rely upon the credibility of its witnesses to prove the charges against Petitioner. Deborah, who testified at trial, had an I.Q. of only 60, which put her in the mentally retarded range of intellectual functioning. As such, it was not unreasonable for counsel to attack her credibility indirectly.[3] From the trial transcript (Doc. No. 5-11), it appears that counsel did that by presenting evidence that the source of Deborah's complaints of abuse was Antoszyk, whom he portrayed as biased and who wanted Deborah removed from her family.

---

[2] Petitioner contends that the appellate court concluded counsel performed deficiently. (Pet. 9, Doc. No. 1.) She is incorrect. The court did not conduct a performance analysis under Strickland; instead, it discussed counsel's performance in the context of its prejudice analysis under the plain error standard. Black, 735 S.E.2d at 201.

[3] Counsel's cross-examination of Deborah was patient and respectful. In contrast, he was aggressive and confrontational with Mary and Sarah.

To that end, counsel cross-examined Antoszyk aggressively, focusing on her objectivity. Antoszyk's testimony revealed negative personal opinions of Petitioner, Deborah's aunt, and Deborah's grandmother, whom she accused of manipulating Deborah into recanting her claims of abuse. She acknowledged voicing concern in a meeting with colleagues and Deborah's family that one of Deborah's uncles, who was present and whom she had never before met, might "prime" Deborah's brother for sexual activity, despite having no evidence to support that concern. (Trial Tr. 395-96, Doc. No. 5-11.) Additionally, Antoszyk was quick to attribute Deborah's poor hygiene and invisible friends, among other things, to neglect and sexual trauma rather than to her low intellectual functioning.

Defense counsel also presented witnesses who testified that Deborah told them Antoszyk was putting words in her mouth and trying to get her to say things she did not want to say. See Black, 735 S.E.2d at 198, 201. Deborah's brother testified that he stopped going to see Antoszyk because she was trying to put words in his mouth. See id. Additionally, the director of a program providing services to people with special needs testified that Antoszyk had upset Deborah and her brother by telling them their family was "dysfunctional." See id. at 201. This testimony was corroborated by witnesses for both the State and the defense. Counsel called other witnesses who testified that Deborah had publicly and privately stated that she had lied about her parents. See id. at 198, 201. A number of witnesses also testified that Deborah always had to be forced to bathe and brush her teeth no matter whom she stayed with and that she had had an invisible friend named Margaret since she was a little girl.

In light of this strategy, it would not have been unreasonable for defense counsel to view Antoszyk's insistence that Deborah was sexually abused as either immaterial or as bolstering his portrayal of her as biased. The evidence elicited and introduced by counsel could have led a

12

reasonable juror to question Antoszyk's objectivity and, consequently, her insistence that Deborah was believable. As such, Petitioner has failed to overcome the presumption that counsel had sound strategic reasons for not objecting to Antoszyk's improper testimony. See Strickland, 466 U.S. at 689.

Moreover, there is not a reasonable probability that the result of Petitioner's trial would have been different had Antoszyk's improper testimony been excluded. See Strickland, 466 U.S. at 694. "In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." Richter, 562 U.S. at 112. Instead, "[t]he likelihood of a different result must be substantial, not just conceivable." Id.

Although Antoszyk testified that Deborah exhibited the characteristics typical of someone who had been sexually abused (Trial Tr. 371, Doc. No. 5-11), she did not testify about any specific instances of abuse or repeat any details that Deborah had provided of the abuse. Furthermore, she admitted that her opinion that the sexual abuse began at a young age was not based upon a specific incident alleged by Deborah but upon Deborah's lack of maturity, which she also acknowledged could be attributed to Deborah's low IQ and ADHD diagnosis. (Trial Tr., supra, at 343, 355.) Most important for Petitioner, however, Antoszyk admitted that she could not corroborate Deborah's testimony that Deborah had told Petitioner about Black's first sexual assault. (Trial Tr., supra, at 371.)

On the other hand, Deborah's cousin, Mary, offered some corroborative support for Deborah's testimony. Both she and Deborah testified that Deborah had confided in her that Jimmy Black had been "'touching [Deborah] with his stuff.'" (Trial Tr., supra, at 45-46, 134, 137-38, 160.) Mary testified further that she told Petitioner and Black what

13

Deborah had said, that they both denied that it was true, and that they "got on [Deborah] for saying that it was." (Trial Tr., supra, at 46.) Antoszyk did not interview, evaluate, or treat Mary (or Sarah).

Jurors also viewed a video-taped interview conducted by another social worker during which Deborah used dolls to demonstrate what her father had done to her. (Trial Tr., supra, at 416.) Additionally, Sandra Honeycutt, the Department of Social Services investigator who investigated Deborah, Mary, and Sarah's allegations of sexual abuse, testified that Deborah's trial testimony regarding her father's actions was consistent with her testimony at a custody hearing in 2009. (Trial Tr., supra, at 451.)

Ironically, it was Petitioner's own testimony that may have bolstered Deborah's the most. Petitioner's testimony contradicted that of almost every State witness, even on details that were unimportant to her defense. The incidents involving Mary and Sarah were similar, however, and the two girls disliked each other, making it unlikely that they had conspired against Petitioner and her husband. Moreover, the defense did not identify any credible motive for Mary to fabricate her story, and the State presented witnesses who corroborated portions of each girl's testimony. If jurors had little reason to credit Petitioner's testimony regarding Mary and Sarah's allegations, it is not reasonably likely that they would have found Petitioner's testimony regarding Deborah's allegations any more credible.

Additionally, Petitioner's explanations for various incidents strained credulity. For example, she denied knowing that her husband sold marijuana out of their home until he was arrested for that offense. When asked how it was that both of her children knew about the marijuana sales, what was purchased with the proceeds, and where the marijuana was kept,

14

Petitioner stated that they probably had read about it in the newspaper. She testified that she had never given Deborah a purple vibrator, nor told anyone that she had, and suggested that what Deborah thought was a vibrator was actually an electric razor that she used to shave Deborah's pubic area. Her testimony was thoroughly impeached by the State's rebuttal witnesses who had documented a pre-trial admission by Petitioner that she had given Deborah a purple vibrator to use to masturbate. In short, for a juror to have found Petitioner credible, he would have had to believe that almost every witness called by the State testified untruthfully.

Given the totality of the evidence and that Petitioner gave the jury little reason to believe her testimony, it was not reasonably probable that there would have been a different result in the charges related to Deborah had Antoszyk's improper testimony been struck. See Strickland, 466 U.S. at 694. Thus, Petitioner has failed to demonstrate that trial counsel provided ineffective assistance when he did not object to Antoszyk's improper statements. See id.

## IV. ORDER

**IT IS, THEREFORE, ORDERED** that:

1) The Petition for Writ of Habeas Corpus, Doc. No 1, is **DENIED**;

2) Respondents' Motion for Summary Judgment, Doc. No. 4, is **GRANTED**, and

3) Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, the Court declines to issue a certificate of appealability as Petitioner has not made a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 474, 484

(2000) (holding that when relief is denied on procedural grounds, a petitioner must establish both that the correctness of the dispositive procedural ruling is debatable, and that the petition states a debatably valid claim of the denial of a constitutional right).

**SO ORDERED.**

Signed: June 18, 2015

Richard L. Voorhees
United States District Judge